IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

WILLIAM GERARD BROWN,

　　Defendant.

CRIMINAL CASE NO.
1:17-CR-142-ELR-LTW

_____

### MAGISTRATE JUDGE'S ORDER, FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Pending before this Court are Defendant William Brown's Unopposed Motion for Extension of Time to File Pretrial Motions and to Continue Pretrial Conference (Doc. 20), Motion to Suppress Evidence (Doc. 24), Motion to Suppress Statements (Doc. 25), Motion to Adopt and Amend Defendant's Motion to Suppress (Doc. 35), and Post-Hearing Motion to Suppress Evidence (Doc. 39).  For the reasons outlined below, Defendant's Motions to Suppress Evidence should be **GRANTED IN PART AND DENIED IN PART** (Doc. 24, 39), and Defendant's Motion to Suppress Statements (Doc. 25) should be **DENIED**.  Defendant's Motion for Extension of Time to File Pretrial Motions and to Continue Pretrial Conference (Doc. 20) and Motion to Adopt and Amend Defendant's Motion to Suppress (Doc. 35) are **GRANTED**.

## UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PRETRIAL MOTIONS AND TO CONTINUE PRETRIAL CONFERENCE

In Defendant's Unopposed Motion for Extension of Time to File Pretrial Motions and to Continue Pretrial Conference, Defendant sought an extension of the deadline for filing pretrial motions in the case, through and including August 17, 2017.  For good cause shown, Defendant's Motion is **GRANTED NUNC PRO TUNC**.  (Doc. 20).

## MOTION TO SUPPRESS STATEMENTS

In Defendant's Motion to Suppress Statements, Defendant perfunctorily argues that all post-arrest statements he made to law enforcement officers should be suppressed because any statements by Brown were made involuntarily and without a knowing waiver of his <u>Miranda</u> rights.  (Doc. 25).  This Court held an evidentiary hearing on the matter on October 25, 2017.  (Doc. 37).  Following the hearing, Defendant prepared a post-hearing brief, but never addressed his former argument that his statements should be suppressed.  Because Defendant never perfected his Motion to Suppress Statement as to his original arguments for suppression raised in his opening brief, they have been abandoned.  <u>See</u> <u>United States v. Rosso</u>, No. 3:14-CR-00014-TCB, 2015 WL 7115860, at *28 n.26 (N.D. Ga. Nov. 12, 2015); <u>United States v. Cadet</u>, No. 1:11-CR-00522-WBH, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), <u>R. & R. adopted</u>, No. 1:11-CR-113-WBH-2, 2013 WL 504815 (N.D. Ga. Feb. 8, 2013); <u>United States v. Chappell</u>, No. 1:10-CR-513-WSD-ECS, 2011 WL 5353016, at *5 (N.D. Ga. May 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned); <u>United States v. Shorr</u>, No. 1:07-CR-182-1-

2

TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same).   Accordingly, Defendant's Motion to Suppress Statements should be **DENIED**.  (Doc. 25).

## MOTION TO ADOPT AND AMEND DEFENDANT'S MOTION TO SUPPRESS

Defendant points out in his Motion to Adopt and Amend Defendant's Motion to Suppress (Doc. 35) that his previous counsel filed a motion to suppress evidence which challenged evidence seized during Defendant's January 12, 2017 arrest.  With the advent of new counsel, Defendant now seeks to suppress evidence relating to his April 28, 2017 arrest as well.  Thus, in the Motion, Defendant seeks to permit his new counsel to adopt the arguments within his initial Motion to Suppress and amend the Motion to reflect that Brown seeks to suppress the evidence obtained during his April 28, 2017 arrest.  The Government has not filed a brief in opposition to Defendant's Motion, and in fact, Defendant indicates in his brief that the AUSA assigned to the case indicated to him that she was under the impression that his original Motion to Suppress sought to suppress evidence collected in connection with the April 28, 2017 arrest.  For good cause shown, Defendant's Motion to Adopt and Amend is **GRANTED**.  (Doc. 35).

## MOTION TO SUPPRESS EVIDENCE

On April 25, 2017, a grand jury in the Northern District of Georgia returned an Indictment and the Indictment was superseded on July 25, 2017.  The superceding Indictment charged Defendant with two counts of knowingly possessing a firearm after having been convicted as a felon in violation of 18 U.S.C. § 922(g)(1).  (Doc. 14).  In Defendant's Motions to Suppress, Defendant argues physical evidence collected when

3

he was arrested on January 12, 2017, and on April 28, 2017, such as firearms, should be suppressed because the law enforcement officers conducting the search stopped him without having reasonable suspicion that he had committed a crime.  (Doc. 24, 39).

## I.    FACTUAL BACKGROUND

### A.    The January 12, 2017 Stop

On January 12, 2017, Virginia Pena Barrientos, who has served as a City of Atlanta Peace Officer since August 26, 2013, was patrolling in Zone 4, which is the West End area.  (Tr. of Oct. 25, 2017 Evid. Hr'g, hereinafter "Tr.," 5-7).  At that time, Officer Barrientos was part of the Crime Suppression Unit or FIT (Field Investigative Trained Officer).  (Tr. 5-6).  The Crime Suppression Unit's main purpose is to be proactive instead of reactive and thus, members of the unit patrol for suspicious activity instead of responding to 911 calls.  (Tr. 6-7).  The Crime Suppression Unit targets mostly Part 1 crimes, meaning crimes like murder, rape, vehicle larcenies, carjackings, and armed robberies.  (Tr. 7).

Officer Barrientos' supervisor instructed Officer Barrientos and Officer Mayfield,[1] her partner for the day, to perform a directed patrol of the West End area, specifically the area around 837 Lee Street, because of its high crime statistics.  (Tr. 29).  Performing a directed patrol meant that the officers targeted the West End area and looked for suspicious activity.  (Tr. 29).  While patrolling, Officer Barrientos rode in the passenger seat while Officer Mayfield drove the car.  (Tr. 8).

---

[1]  Officer Mayfield's first name is not in evidence.

4

Officer Barrientos testified that while driving on West Whitehall Street Southwest, the officers viewed an "overabundance of vehicles" parked at 837 Lee Street where a food mart and a recording studio were located. (Tr. 9-10). According to Officer Barrientos, the parking lot was full and some of the vehicles were not parked in parking spaces. (Tr. 9). Officer Barrientos states that she also observed the presence of "a high amount of males" in the parking lot. (Tr. 10). Based on her training and experience, Officer Barrientos testified that the presence of a large number of individuals in a parking lot for a food mart can indicate that the individuals are loitering because typically, patrons of a food mart make their purchases and leave, but do not congregate there for an extended period of time. (Tr. 11).

Officer Mayfield pulled the patrol car into the parking lot, but did not activate the vehicle's blue lights or dash camera. (Tr. 65). According to Officer Barrientos, when the patrol car pulled into the parking lot, the majority of the males congregating in the parking lot scattered in different directions. (Tr. 10). Although Officer Barrientos' body camera was active when the officers drove into the parking lot, the body camera did not capture images of individuals dispersing through the parking lot upon the arrival of the patrol car. (Gov't's Ex. 1). In fact, the body camera footage showed an environment where it appeared that people were not scurrying in different directions. (Gov't's Ex. 1). Likewise, the body camera footage did not depict the presence of "a high amount of males" or cars parked where there were no parking spaces. (Gov't's Ex. 1). It appears, however, that when the patrol car was initially traveling through the parking lot, the

5

camera must have been pointed upwards because the footage did not reflect what was happening at eye level.  (Gov't's Ex. 1).

Officer Barrientos testified that she observed Defendant Brown, who had been standing outside the door of the food mart, make a beeline straight into the food mart after Officer Mayfield pulled the patrol car into the parking lot. (Tr. 11, 41-42).  Officer Barrientos defines "beeline" as going directly from point A to point B without any pauses in between.  (Tr. 41).  According to Officer Barrientos, at that time, Defendant proceeded directly into the store and did not stop and talk to anyone.  (Tr. 41).  Officer Barrientos testified that Defendant entered the food mart while she was still sitting in her vehicle.  (Tr. 36).

When Officer Barrientos opened the door of the patrol car, she could smell raw marijuana. (Tr. 10, 36).  Officer Barrientos proceeded towards the entry door of the store so that she could talk with Defendant.  (Gov't's Ex. 1; Tr. 44).  Officer Barrientos admits that the smell of marijuana was not what motivated her to talk with Defendant, and she did not believe that the smell of raw marijuana emanated from him.  (Tr. 36, 38).  Officer Barrientos believes that she had a reasonable articulable suspicion to stop and talk to Defendant at that point because he made a beeline into the food mart upon her arrival, that appeared suspicious to her, and because she wanted to investigate further and speak with him.  (Tr. 44).  Officer Barrientos also noted that although she could not attribute the odor of marijuana traveling through the parking to Defendant, she wanted to confirm or dispel whether he was involved in the criminal activity occurring in the parking lot.

AO 72A
(Rev.8/82)

(Tr. 46).  Officer Barrientos admits she did not believe the smell of marijuana in the parking lot came from Defendant's person, that she had no basis to draw a conclusion that he had marijuana on his person, but she suspected that he had marijuana.  (Tr. 38-39, 48-49).  Officers Barrientos and Mayfield approached the store from the front.  (Tr. 12-13).  Officers Maldonado and Owen, who were patrolling in another patrol car, viewed the activity at the same location, 837 Lee Street, and agreed that it was worth looking into and went around to the back of the store.  (Tr. 12).

After Officer Barrientos exited the patrol car, she activated her department-issued body camera, which she was wearing on her chest.  (Tr. 13-14).  Officer Barrientos headed for and entered the store.  (Tr. 16-18; Gov't Ex. 1).  Officer Barrientos testified that Defendant was free to leave until she entered the store.  (Tr. 43).   On the way to the store, Barrientos passed three other people.  (Tr. 39).  During the evidentiary hearing, Officer Barrientos was asked to explain why she passed other individuals and instead followed Defendant.  (Tr. 39).  Officer Barrientos testified that the three other people did not run and did not dodge into somewhere else.  (Tr. 39).  Barrientos also testified that three other officers were already addressing other persons.  (Tr. 39).

In her police report, Officer Barrientos indicated that when she entered into the store, Defendant's back was to her, but admitted on cross-examination after having seen the body-cam video that Defendant's back was not facing her.  Tr. 62).  The video footage depicts Defendant facing the front door as Officer Barrientos enters into the food mart.  (Gov't Ex. 1).  When the body-cam video footage inside the food mart begins,

Defendant is heading towards the front door and Officer Barrientos. (Gov't's Ex. 1). Based on the video footage, it is difficult to discern whether Defendant was already walking towards the front door when Officer Barrientos entered the food mart or whether he began walking to the front door after Officer Barrientos entered. (Gov't's Ex. 1).

Once inside the food mart, Officer Barrientos said to Defendant, "Hey partner, what's up? Let me talk to you." (Tr. 17-18). Defendant responded, "What?" (Gov't's Ex. 1). Officer Barrientos also asked Defendant if he had identification on him. (Gov't's Ex. 1). Defendant responded, "Yes, Ma'am," but continued to walk towards the doors behind Officer Barrientos. (Gov't's Ex. 1; Tr. 51-52, 54). At the time, Officer Barrientos was standing about a foot inside the two glass door entryway at the front of the store. (Tr. 17, 50-51). Only one of the doors was operational and Officer Barrientos stood with her back directly in front of the operational door. (Tr. 17, 50-51). There was no other exit door for the store. (Tr. 55).

Officer Barrientos stated to Defendant in an annoyed tone, "Don't try to walk away." (Gov't's Ex. 1). Defendant attempted to continue towards the front doorway, and said, "Hold on. What's going on?" (Gov't's Ex. 1). As Defendant headed towards Officer Barrientos and the front door, Officer Barrientos did not yield the path to the doorway, but instead performed a hand check on Defendant's chest to push him away from her once he approached her. (Tr. 19, 51-52). Officer Barrientos states that she touched Defendant before he touched her when she "hand-checked" him on his chest. (Tr. 19, 52; Gov't's Ex. 1). Officer Barrientos states that she hand-checked Defendant

8

"because he [was] pushing his body weight against [hers] to get out the door." (Tr. 19, 51-52). Officer Barrientos testified that she was not going to allow Defendant to pass because he was going to be detained. (Tr. 55-56). Officer Barrientos also testified, "My purpose was not to let him get away." (Tr. 55). Officer Barrientos further testified that if Defendant had said, "Ma'am, excuse me, you're in the middle of the door, can you please get out of my way so I can go about my business," she still would not have allowed him to leave the building. (Tr. 56).

Seconds after Defendant tried to push by and exit the front door, Officer Mayfield shoved Defendant, and Defendant flew back about six or seven feet. (Gov't's Ex. 1; Tr. 19). After being pushed back, Defendant responded, "Hey, what did I do?" (Gov't's Ex. 1). Officer Mayfield proceeded to violently force Defendant to the ground, saying "Get the fuck down!" (Gov't's Ex. 1). Defendant plaintively asked several times, "What did I do, sir? What did I do?" (Gov't's Ex. 1). Officer Mayfield responded each time with, "Get the fuck down!" (Gov't's Ex. 1). The body-camera video did not clearly depict all of the altercation and it is not apparent from the video whether or in what way Defendant was resisting the officers' attempts to immobilize him. (Gov't's Ex. 1). It did appear, based on the footage, that Defendant was at or near the ground most of the time during the altercation. (Gov't's Ex. 1).

Defendant asked a few more times what he had he done and Officer Mayfield repeatedly responded that he was going to "taze the fuck out of" Defendant. (Gov't's Ex. 1). Another couple of officers began assisting Officers Mayfield and Barrientos.

(Gov't's Ex. 1).  Officer Mayfield used his taser on Defendant while telling Defendant to "get the fuck down."  (Tr. 20; Gov't's Ex. 1).  After feeling the effects of the taser, Defendant yelled in pain and then exclaimed, "Yes sir!  Yes sir!  Yes sir!"  (Gov't's Ex. 1).  The officers placed Defendant in handcuffs while he was face down on the ground.  (Gov't's Ex. 1).  Officer Barrientos then asked the Defendant, "Did I say you did something?"  (Gov't's Ex. 1).  Defendant responded, "No, ma'am."  Officer Barrientos replied, "Then why the fuck were you pushing up on me?"  Defendant responded, "I gotta little marijuana on me, Ma'am."  (Tr. 21).

Defendant was taken to the patrol car, placed under arrest, and searched incident to arrest.  (Tr. 21).  During the search, the officers found a baby bottle filled with "Lean," which is a mixture of promethazine, a drug, and some other liquid in Defendant's front pocket.  (Tr. 21).  Officer Barrientos recovered a loaded handgun from Defendant's left top pocket and retrieved marijuana from his front left pants pocket.  (Tr. 22-23).

On January 13, 2017, Defendant made a call to his girlfriend, Shant-ee Tarver, on the jailhouse telephone which was recorded.  (Tr. 72-73, 179-80).  Defendant told his girlfriend during the call that when he was intercepted by law enforcement officers inside the store, the officer jumped out, "ran up on him," and requested his identification.  (Gov't's Ex. 2, at 2.40).  Defendant states that when he tried to exit through the door, the law enforcement officer tried to stop him, and he tried to push his way out of the door so he could get rid of the "scrap."  (Id. at 2:55).

**B.    The April 28, 2017 Stop**

10

On April 28, 2017, Officers Thomas Crowder and his partner, Edgar Magana, who are currently employed by the Atlanta Police Department with the Zone 3 Crime Suppression/FIT Team, were patrolling around 7:50 p.m.  (Tr. 87-90, 101, 133-34). During the patrol, Officer Crowder observed the Defendant sitting on a fence line running parallel to Crew Street.  (Tr. 90, 96; Gov't's Ex. 5-6; Def.'s Ex. 23).   This was the first time Officer Crowder had encountered Defendant.  (Tr. 101).  Officer Crowder testified that Defendant was rolling a marijuana cigarette with white paper, but he did not see any marijuana at the time and he did not know at that time whether Defendant was rolling tobacco into the paper.  (Tr. 90, 104-05).

Officer Magana testified that Officer Crowder told him that he thought he saw Defendant rolling something that looked like a blunt.  (Tr. 135, 149).   In Officer Magana's police report, Officer Magana indicated that Officer Crowder noticed that a male was rolling a blunt in his mouth.  (Tr. 149, 154-55).  Prior to that time, Officer Magana had not seen anyone roll a blunt and did not smell marijuana.  (Tr. 147-48, 150). After Officer Crowder told Officer Magana that Defendant was rolling a blunt, Officer Magana "saw something in Defendant's mouth like he was actually rolling a blunt, and documented that Defendant appeared to have a blunt in his police report."  (Tr. 135, 155).  Officer Magana admits that he still does not know for sure if he saw a blunt.  (Tr. 155).  Although Officer Magana testified that the color of the blunt was brown, and appeared to agree that the blunt was not white, he did not indicate what color the blunt was in his police report.  (Tr. 155-56).

11

After passing Defendant by about one car length, Officer Crowder put the patrol car in reverse and observed Defendant continuing to roll a cigarette. (Tr. 90, 135, 149). Officer Crowder did not utilize the emergency lights on his vehicle at the time, even though the emergency lights would have activated his dash camera. (Tr. 107). Officer Crowder testified that during the encounter, he did not activate his lights because things happened so quickly. (Tr. 131). Officer Crowder also testified that in this situation, he would not want to activate his lights because it would draw attention to the situation and create a crowd and a scene. (Tr. 130). Officer Crowder did not turn on his dash camera or the internal microphone that could have recorded internal conversations within the patrol car, nor did he activate his body camera because he lost it in a foot chase two days before his encounter with Defendant.[2] (Tr. 107-10).

Officer Crowder testified that the moment he began reversing his vehicle, Defendant was not free to leave, but he did not tell that to the Defendant. (Tr. 105, 126). Instead, Defendant was going to be detained at that point because Officer Crowder

---

[2] The standard operating procedure requires that the body cameras be used during the course of the officers' job duties for the purpose of obtaining potential evidence in the prosecution of criminal and traffic offenses. (Tr. 118). According to the standard operating procedure, officers are to place their body cameras into recording mode when conducting vehicle or pedestrian stops, when conducting vehicle or foot pursuits, and when obtaining statements by suspects. (Tr. 121-23). Officer Crowder admits that he was investigating a criminal offense, conducting a vehicle or pedestrian stop, conducting a vehicle or foot pursuit, and obtaining a statement from a suspect during his encounter with Defendant. (Tr. 118, 122-23). Officer Magana admits that he had received training on the use of body cameras and that the standard operating procedure required that he activate his body camera under the circumstances, but he did not do so because the officers had only had their body cameras for a week, and he was not accustomed to activating it. (Tr. 152-54).

believed Defendant was rolling a marijuana joint.  (Tr. 106).  Officer Magana similarly testified at the point that the officers stopped their car and started communicating with Defendant, he was not free to go.  (Tr. 151).  Although Officer Crowder's windows were down, he did not smell any burnt or raw marijuana.  (Tr. 106).  When asked whether Defendant could have been rolling tobacco or coffee grains into the paper, Officer Crowder responded that he could have been.  (Tr. 106-07).

Officer Crowder asked Defendant was he was doing and asked him "could he come here for a second."  (Tr. 90).  According to Officer Magana, Officer Crowder asked Defendant what he was doing.  (Tr. 158).   Defendant approached the patrol car, but asked what had he done wrong.  (Tr. 90, 125).  At that point, according to Officer Crowder, Defendant pulled his jeans up,[3] put his hands on his side, and took off running.  (Tr. 90-91, 137).  Officer Magana testified that when Defendant pulled up his pants, it appeared as if he had a blunt in his left hand.  (Tr. 136).  Officer Magana exited the vehicle, pursued Defendant, and yelled, "stop, Atlanta police" or "police stop."  (Tr. 137).  Officer Magana also activated his body camera.  (Tr. 138).  At some point during the chase, Officer Magana noticed that Defendant had a black handgun in his right hand, but later in the chase after Defendant stumbled through a fence, the handgun was no longer in his hand.  (Tr. 140-45).

Officer Crowder drove the car northbound on Crew Street, made a right turn, and

---

[3] Officer Magana testified that in his experience, when a suspect pulls his pants up, the suspect is going to flee on foot.  (Tr. 137).

13

returned eastbound on Haygood, and then parked his car. (Tr. 91-93). At that point, Officer Crowder observed Defendant and Officer Magana coming through the wood line. (Tr. 91). Defendant initially headed towards Officer Crowder, but changed course and went east bound. (Tr. 93). Officer Crowder cut Defendant off and intercepted him. (Tr. 93-94). The body-cam video footage depicts Defendant running straight into Officer Crowder, who immediately placed Defendant into handcuffs. (Gov't's Ex. 3). By the time Officer Crowder intercepted Defendant, Defendant had run at full speed through fences, woods, and around buildings for forty-five seconds. (Gov't's Ex. 3).

Defendant told Officer Crowder before Officer Crowder could put him into handcuffs that the reason he was running and the only thing he had on him was "a little weed." (Tr. 94). Officer Crowder noticed a bag of marijuana in Defendant's right hand as he placed Defendant in handcuffs. (Tr. 94; Gov't's Ex. 3). Defendant then dropped the bag of marijuana and used his right foot to stomp the marijuana into the ground. (Tr. 94-95). Officer Crowder quickly frisked Defendant for weapons. (Tr. 95). During the search, Officer Crowder discovered nearly $900 in cash and collected nearly twenty-five grams of marijuana from the ground. (Tr. 95).

Because Officer Magana had observed Defendant throw a gun earlier during the encounter, Officer Magana went with another officer to look for the weapon. (Tr. 95-96). Another officer at the scene recovered the firearm. (Tr. 145). Officer Magana never went back to the place where he saw Defendant rolling a blunt to try to recover the blunt. (Tr. 162).

14

Shant-ee Tarver, Defendant's girlfriend since 2009, appeared at his evidentiary hearing and testified that she and her best friend were present at the time he was arrested. (Tr. 168).  According to Tarver, on April 28, 2017, she met Defendant to get some money to pay a debt Tarver owed her sister.  (Tr. 171).  Tarver and her friend were parked on Crew Street and were waiting for Defendant to approach the vehicle.  (Tr. 170-72).  According to Tarver, Defendant was seated on some benches in the area with his friend Goose.  (Tr. 171).  Tarver testified that Defendant walked over to her, gave her some money, started eating wings with her, and conversed with her.  (Tr. 173-74).  About ten or fifteen minutes later, the police drove by.  (Tr. 174).  At the time, Defendant was standing on the sidewalk right by the car by the fence.  (Tr. 174).  After the police car passed them by about five or six car lengths, it backed up towards them.  (Tr. 175).  Tarver states that when the officers reversed they said to Defendant, "Hey, man, come here."  (Tr. 176).  Defendant responded, "Hey, man, come here?"  (Tr. 176).  The officer repeated, "Yeah, hey, man, come here."  (Tr. 176).  Defendant responded, "What I do wrong?  Like I'm not doing anything."  (Tr. 176).  According to Tarver, the officers exited the car.  (Tr. 176).  Tarver states that at some point, Defendant fled on foot.  (Tr. 178).  Tarver insists that Defendant did not have a blunt on him, they were not smoking at the time, and they had not been smoking prior to the arrival of the police.  (Tr. 176-77).  Tarver states that Defendant held a chicken wing in his left hand.  (Tr. 177).

## II.   LEGAL ANALYSIS

Defendant argues evidence obtained as a result of the January 12, 2017 and April

15

28, 2017 stops should be suppressed because law enforcement officers unlawfully seized him without reasonable suspicion that he had committed or was about to commit a crime and the evidence during the arrests were obtained as a product of the unlawful seizures.

### A.   The January 12, 2017 Stop

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."   United States v. Turner, 684 F. App'x 816, 820 (11th Cir. 2017) (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).   Even without probable cause, the police may stop individuals and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.   United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (citing Terry v. Ohio, 392 U.S. 1 (1968)). Reasonable suspicion must be more than inchoate hunch and instead requires that police articulate some minimal, objective justification for an investigatory stop.   United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003); Tapia, 912 F.2d at 1370.   The police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further intrusion under the totality of the circumstances.   United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009); Tapia, 912 F.2d at 1370.   Officers are expected to use their experience and specialized training to draw inferences from the cumulative information available to them, including inferences that may evade untrained observers.   United States v. Bautista-Villanueva, 524 F. App'x 476, 478 (11th Cir. 2013) ("This process allows

16

officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). Additionally, a reviewing court "may not consider each fact only in isolation and reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation'" and even if the suspicion ultimately turns out to be incorrect. Bautista-Silva, 567 F.3d at 1272; Bautista-Villanueva, 524 F. App'x at 478.

        1.    Defendant Was Detained When He Was Thwarted From Exiting the Food Mart

In this case, the question of whether or not law enforcement officers had reasonable suspicion to detain Defendant turns in part on when the detention occurred. "To determine whether reasonable suspicion exists, we look to see whether 'the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate." United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003).

The detention does not necessarily occur at the moment police begin interacting with a suspect. For instance, consensual encounters are not subject to Fourth Amendment scrutiny. United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006). Law enforcement officers do not violate the Fourth Amendment prohibition on unreasonable seizures merely by approaching individuals in public places and putting questions to them if they are willing to listen. Florida v. Royer, 460 U.S. 491, 197-98 (1983); United States v. Drayton, 536 U.S. 194, 200-01 (2002); Perez, 443 F.3d at 777-78; United States

v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986) (explaining that "[a] police officer may approach an individual in a public place, identify himself as a law enforcement officers, and, in a non-coercive manner, ask the individual a few questions, without converting the encounter into a seizure"); United States v. Mancini, 802 F.2d 1326, 1329 (11th Cir. 1986) (finding no coercion and thus no detention where investigative stop took place in public area in airport, agents wore no uniforms and displayed no weapons, agents did not summon defendant to them, but instead approached him and identified themselves, agents did not block defendant's path or otherwise intercept him, agents maintained a conversational tone of voice, agents never accused defendant of wrongdoing, and agents requested, but did not demand to see defendant's ticket and identification and returned both promptly); United States v. Rodriguez-Franco, 749 F.2d 1555, 1060 (11th Cir. 1985) (concluding that questioning by INS officers regarding the defendant's citizenship and subsequent request that defendant accompany agents to nearby bench was not seizure because there was no force or intimidation and the defendants did so voluntarily). Thus, in this case, it was not unlawful for Officer Barrientos to follow Defendant into the food mart and attempt to ask him questions, even if she did not have reasonable suspicion to do so at that time. Franklin, 323 F.3d at 1301.

"A seizure occurs for Fourth Amendment purposes, . . . only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained." Perez, 443 F.3d at 778. When determining whether there has been such a show of

authority, factors to be considered include:

> Whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (citing United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991)); see also United States v. Cusick, 559 F. App'x 790, 791 (11th Cir. 2014). Other factors include the extent to which the officers physically restrained the individual, the officers' demeanor, and whether the officers impeded the suspect's progress. United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989).

"If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." Drayton, 536 U.S. at 200-01. The applicable test for determining whether a person has been seized within the meaning of the Fourth Amendment is an objective test. "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would not have believed that he was not free to leave." Craig v. Singletary, 127 F.3d 1030, 1041 (11th Cir. 1997) (citing United States v. Mendenhall, 446 U.S. 544, 555 (1980)). "[T]he suspect's subjective views are not determinative." Craig, 127 F.3d at 1041. Likewise, the subjective views of law enforcement officers who are present are also not relevant, except to the extent that they were communicated to the suspect at the time. Craig, 127 F.3d at 1041 (citing Mendenhall, 446 U.S. at 554 n.6.

It is no surprise that the Defendant and the Government have differing views

19

regarding when the officers detained Defendant on January 12, 2017.  Defendant suggests that he was not free to leave once Barrientos entered the food market to question him because Barrientos testified that he was not free to leave at that time. Defendant further argues that at a minimum, a reasonable person in his position would not have felt free to leave when Officer Barrientos blocked his path and instructed him not to walk away from her.  In response, the Government argues Defendant was not detained until Officer Barrientos exercised physical force or Defendant submitted to the assertion of her authority.  Thus, the Government argues, Defendant was not free to leave until Officer Barrientos made contact with his chest in the defensive hand check move when he tried to push past her out of the door.

The fact that Officer Barrientos believed Defendant was not free to leave from the moment she entered the food mart is not relevant in the determination of whether Defendant was seized.  As noted above, the subjective views of law enforcement officers present at the scene as to whether the defendant was free to leave are not relevant, except to the extent that they were communicated to the suspect at the time.  Craig, 127 F.3d at 1041 (citing Mendenhall, 446 U.S. at 554 n.6).  There is no indication that Officer Barrientos communicated her belief that Defendant was not free to leave until she instructed him not to walk away from her.

Nevertheless, this Court agrees with the Government that the seizure did not occur until Officer Barrientos made the hand check move when Defendant tried to move past her out of the door.  While Barrientos did exercise a show of authority when she

20

commanded Defendant not to walk away after she had told him that she wanted to talk to him, Defendant did not assent to that authority and continued walking out the door. (Tr. 51-52). A seizure by means of show of authority requires both a show of authority and *submission* to that authority. United States v. Dolomon, 569 F. App'x 889, 892-93 (11th Cir. 2014); United States v. House, 684 F.3d 1173, 1199 (11th Cir. 2012) (citing California v. Hodari D, 499 U.S. 621, 628-29 (1991)). For instance, a law enforcement officer effects a seizure by means of a show of authority when "the officer's words and actions would have conveyed to a reasonable person that he was being ordered to restrict his movement *and those words and actions actually produce his stop*." House, 684 F.3d at 1199 (internal quotations omitted) (emphasis added). "An attempted seizure, without actual submission, is not a seizure for Fourth Amendment purposes." Dolomon, 569 F. App'x at 892. Here, Defendant did not actually stop when Barrientos commanded him to do so and thus did not submit to her authority. Therefore, Defendant was not seized at that time. See, e.g., United States v. Freeman, 735 F.3d 92, 95-97 (2d Cir. 2013) (holding that a suspect who continued walking when approached by a police officer did not submit until physically restrained by the officer); United States v. Hughes, No. 1:16-CR-00451-ELR-JSA, 2018 WL 1148125, at *4 (N.D. Ga. Jan. 29, 2018) (concluding that defendant was not seized when he ignored officers' commands, but was seized once he submitted to the officers' commands and stopped walking away). Instead, Defendant's seizure actually occurred moments later when Officer Barrientos gave him a hand check and the officers on the scene attempted to place him in handcuffs.

21

(Tr. 19-20).  At that point, no reasonable person would feel free to leave, and indeed, Defendant could not leave.[4]

        2.      <u>The Officers Did Not Have Reasonable Suspicion at the Time They Stopped Defendant</u>

Because Defendant was seized at the time Officer Barrientos performed her hand check, "the officers can consider everything that happened up to that point to establish reasonable suspicion." <u>United States v. Franklin</u>, 323 F.3d 1298, 1301 (11th Cir. 2003). The Government argues reasonable suspicion had already accrued by the time Officer Barrientos hand checked Defendant because (1) the interaction between Defendant and the police occurred at night in a high crime area; (2) individuals were loitering in the small parking lot of 837 Lee Street which was a probable violation of O.C.G.A. § 16-11-36(a); (3) Officer Barrientos smelled raw marijuana when she exited the patrol car; and (4) Defendant engaged in behavior designed to evade law enforcement when he made a "beeline" into the food mart when the patrol car entered the parking lot, Defendant turned to leave the food mart when Officer Barrientos communicated with him, and Defendant headed straight into Officer Barrientos and attempted to push past her when he persisted in his attempt to leave.

        a.      <u>High-Crime Area</u>

Under the totality of the facts and circumstances in this case, this Court cannot

---

[4] The Government admits that Defendant was seized when Officer Barrientos hand checked Defendant.  (Gov't's Br. 14).

conclude that Officer Barrientos and the other officers on the scene had reasonable suspicion to detain Defendant at the time of the seizure.  First, as the Government acknowledges, the fact that the detention occurred in a high crime area is a relevant contextual consideration in the analysis, but is by no means dispositive.  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (noting that an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime, but officers may consider the fact that the stop occurred in a high crime area among the relevant contextual considerations in a Terry analysis); United States v. Mitchell, 407 F. App'x 407, 410 (11th Cir. 2011); United States v. Reed, 402 F. App'x 413, 415-16 (11th Cir. 2010). This factor, however, cannot weigh much in the Government's favor during the analysis, because, as discussed below, there were no facts tending to show that Defendant was engaged in any sort of criminal behavior.  See United States v. Johnson, 620 F.3d 685, 692-93 (6th Cir. 2010) (holding that high crime area and late hour are context-based factors that while considered, they would pertain to anyone in the area at the time and should not be given undue weight especially where there is no conduct from the defendant consistent with criminal activity).

b.   <u>Loitering</u>

Officer Barrientos further relies upon the notion that because the parking lot of 837 Lee Street was filled with cars and males were standing around, she reasonably suspected that the individuals were loitering, which the Government points out, is a

23

misdemeanor under O.C.G.A. § 16-11-36(a).  Officer Barrientos testified that it is not normal behavior to congregate in the food mart parking lot for an extended period of time. (Tr. 11).  Officer Barrientos reasons that when one normally goes to a food mart, one normally makes a purchase and then goes about one's business.  (Tr. 11).  In this Court's view, under the facts of this case, loitering did not provide a basis for reasonable suspicion to conduct an investigatory stop of Defendant.   An individual violates Georgia's loitering statute, O.C.G.A. § 16-11-36(a), when the individual is "in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity."  Here, there is an absence of evidence that the Defendant or even the individuals allegedly present in the vicinity of the food mart were acting in a time or in a manner not usual for law-abiding individuals or that there was a basis for "justifiable and reasonable alarm" or "immediate concern for the safety of persons or property."  Officer Barrientos testified that when she pulled into the parking lot on Lee Street that there was an overabundance of vehicles parked and that there were vehicles that were not in parking spaces cramped into the "tiny parking lot" as well as a "high amount of males" in the parking lot. (Tr. 10).  Yet, the body-cam video recording, once it started, did not depict cars crammed into the parking lot or males scattering about and Officer Barrientos neglected to include in her police report that the individuals scattered once the officers's car entered the parking lot.  (Gov't Ex. 1, Tr. 35).  Officer Barrientos never activated the dash camera in her patrol car and never tried to obtain the

24

footage from the cameras in the building where the food mart was located to show all of the individuals scattering. (Tr. 59-62, 64-66). Officer Barrientos did not testify as to what activity would have been usual or unusual for the premises or any basis for "justifiable and reasonable alarm" or "immediate concern for the safety of persons or property."

Likewise, Officer Barrientos did not testify as to any facts which would tend to show that Defendant was not acting in a manner not customary for law abiding individuals or that he did anything to cause "justifiable and reasonable alarm" or "immediate concern for the safety of persons or property." At the time of the arrival of the patrol car into the parking lot, Defendant had been standing near the entrance of the food mart and then entered into the food mart. (Tr. 42). Such activities do not cause reasonable alarm or concern for the safety of persons or property. In no way is it unusual for a patron to stand outside the entrance of the store, and then enter a store. Thus, Defendant's conduct does not provide reasonable suspicion that he was violating the loitering statute or a basis for restricting his freedom to leave. Compare United States v. Carr, 296 F. App'x 912, 916 (11th Cir. 2008) (upholding as reasonably suspicious observations of defendant and passenger loitering at 7:45 p.m. in parking lot of strip mall known for drug activity where defendant and passenger were sitting inside defendant's vehicle that was parked so as to obscure its license plate, where passenger in defendant's vehicle had been involved in previous incidents of loitering and drug activity, and where defendant and passenger appeared surprised at seeing the police and prepared to drive

25

away); Evans v. State, 216 Ga. App. 21, 453 S.E.2d 100, 103 (Ga. Ct. App.1995) (finding reasonably suspicious behavior under O.C.G.A. § 16-11-36 where car was observed in area known for automobile thefts and break-ins, car circled around shopping center parking lot for forty-five minutes without parking, occupants of car did not leave their vehicle to enter a store, and occupants were observed looking closely at another car); Hansen v. State, 168 Ga. App. 304, 308 S.E.2d 643, 644-46 (Ga. Ct. App.1983) (finding reasonable suspicion under O.C.G.A. § 16-11-36 where two men were observed squatting down in parking lot next to car not properly parked in a space in apartment complex designated a high crime area and later drove away and pulled off to the side of the road after passing the police); with United States v. Flores-Uriostegui, No. 1:09-CR-00438-JEC, 2010 WL 8675217 (N.D. Ga. Aug. 9, 2010) (concluding that loitering did not justify finding of reasonable suspicion where defendants were present at a place, time, and manner not unusual for a law-abiding individual because they were merely sitting inside parked car in parking lot within residential apartment complex around 3:00 p.m.); In re J.B., 314 Ga. App. 678, 815-16, 725 S.E.2d 810 (Ga. Ct. App. 2012) (concluding that loitering was not a basis for reasonable suspicion where there was no basis for finding aberrant behavior of the suspect which would alarm a reasonable person that danger existed to persons or property).

### c.   Marijuana Smell in the Parking Lot

The smell of marijuana in the parking lot did not provide reasonable suspicion to justify the stop of Defendant.  Although Officer Barrientos smelled raw marijuana in the

parking lot upon exiting the patrol car, Defendant was no where near her at the time. Defendant had already entered into the food mart before Officer Barrientos even opened the door of her patrol car. (Tr. 11, 36).  There is no basis conclude that the smell of *raw* marijuana would have carried from the entrance of the food mart where Defendant had been standing just before the patrol car entered the parking lot and the place where Officer Barrientos opened her door from the parked patrol car which appeared, based on the video tape, to be more than thirty feet away.  (Gov't's Ex. 1).  Indeed, Officer Barrientos admits that her reason for approaching Defendant "had nothing to do with the smell of raw marijuana," that he was far away from her at the time, and that she did not think the marijuana smell came from him.[5]  (Tr. 36, 38, 46).  Thus, this Court concludes that the smell of marijuana in the parking lot did not justify restriction of Defendant's freedom.

d.   <u>Evasive Tactics</u>

Nor is this Court convinced that evasive tactics provided a basis for reasonable suspicion.  While it is true that evasive behavior and refusal to cooperate on the part of

---

[5] Officer Barrientos later testified that she suspected Defendant was involved in criminal activity in that he had marijuana.  (Tr. 48).  Officer Barrientos admits, however, that she had no basis at that time to draw a conclusion that Defendant had marijuana on his person. (Tr. 36-39, 48-49).  Thus, this Court finds Officer Barrientos' original statements – that she did not think the marijuana smell in the parking lot came from Defendant and that her reasoning for approaching Defendant "had nothing to do with the smell of raw marijuana" – as credible.  (Tr. 36, 38, 46).  Thus, this Court concludes that the presence of marijuana smell was not part of Officer Barrientos reasonable suspicion analysis, but even if it was, it did little to contribute to justification for the stop.

27

the defendant can contribute to reasonable suspicion, Defendant's activities in this case fall short of providing a basis for reasonable suspicion. United States v. Heard, No. 17-12397, 2018 WL 823895, at *8 (11th Cir. Feb. 12, 2018) (noting that refusal to cooperate can certainly contribute to reasonable suspicion); United States v. Mitchell, 407 F. App'x 407, 410 (11th Cir. 2011) (noting that evasive behavior is a pertinent factor supporting reasonable suspicion); United States v. Reed, 402 F. App'x 413, 415-16 (11th Cir. 2010). Although Officer Barrientos testified that Defendant made a "beeline" for the store upon approach of the patrol car into the parking lot, Officer Barrientos described beeline as meaning that he went directly inside the store, unimpeded, without making any stops. (Tr. 11, 41). Officer Barrientos also testified that upon entering the parking lot, Defendant had been standing where a man depicted in the body-cam video was standing. (Tr. 42). The man in the video was standing only a few feet outside the door of the food mart. (Tr. 42). Thus, according to Officer Barrientos, upon the patrol car's arrival, Defendant traveled from just outside the door of the store, to inside the store. Given that Defendant was standing close to the entrance of the store, there is nothing suspicious about going from just outside the entrance of the store to the inside of the entrance of the store upon the police's arrival. There are no facts here that Defendant was headed away from the store and then changed his direction upon the police's arrival. There are no facts here that Defendant sped into the store upon the police's arrival or tried to escape through the rear. (Tr. 40 (admission that Defendant was not running)). There are no facts here that Defendant looked at the officers or even

28

saw the patrol car enter the parking lot.  In this case, there is only the normal behavior of being outside the entrance of a store and then entering a store.  Based on the facts before the Court, this behavior was not suspicious.  Contrast United States v. Briggs, 720 F.3d 1281, 1286-87 (10th Cir. 2013) (noting that a suspect's sudden change of direction and speed of travel, glances over shoulders, seemingly expressing concern about pursuit upon contact with officers can contribute to a finding of reasonable suspicion) with United States v. Sundiata, 3 F. Supp. 2d 682, 689 (E.D. Va. Apr. 7, 1998) (concluding that the government failed to present evidence of evasive conduct where a passenger in a car looked at officers and the car left "quickly" because the word quickly was a subjective term and there was no evidence that the car was speeding, squealed tires leaving a parking space, was operated in an unsafe matter, violated any traffic ordinances, or was operated in anything but a normal fashion).

Likewise, this Court cannot conclude that Defendant's attempt to leave the food mart and refusal to engage with Officer Barrientos provided reasonable suspicion under the circumstances of this case.  Up to the point in which Officer Barrientos enters the food mart, it is clear that any attempt to detain Defendant would be unlawful.  As discussed above, even though the detention occurred in a high crime area, the smell of marijuana emanated from the parking lot, and Defendant entered the store upon the arrival of the police, Officer Barrientos and her colleagues did not have a sufficient basis to form reasonable suspicion.  Accordingly, up until this point, Officer Barrientos and her colleagues had no authority to detain Defendant and Officer Barrientos' order for

Defendant not to walk away from her was an unconstitutional order.  Thus, the question becomes whether Defendant's refusal to interact with police and attempt to leave the store provides reasonable suspicion for the stop.  The Government argues reasonable suspicion for the stop existed for the stop because Defendant was engaged in avoidance behaviors which were suspicious when he, immediately after having entered the store, turned to leave the store after Officer Barrientos attempted to converse with him, and persisted in his attempt to leave by walking straight into Officer Barrientos.  The Government characterizes Defendant's attempt to exit the food mart as a flight and argues pursuant to <u>Illinois v. Wardlow</u>, 528 U.S. 119 (2000), Defendant's "flight" provided a basis for Officer Barrientos' reasonable suspicion.  In support, the Government urges that a suspect's attempt to leave the vicinity where police officers are present may contribute to a finding or reasonable suspicion even if it is not the headlong flight at issue in <u>Wardlow</u>.

In <u>Wardlow</u>, police officers patrolling an area known for heavy narcotics trafficking saw the defendant standing next to a building holding an opaque bag.  528 U.S. at 121.  The defendant looked in the direction of the police officers and fled.  <u>Id.</u> The two police officers caught up with the defendant, stopped him, and patted him down for weapons.  <u>Id.</u>  The defendant argued the evidence obtained during the pat down should be suppressed because the officers did not have reasonable suspicion to justify an investigative stop.  528 U.S. at 122.  The Illinois Supreme Court relying on <u>Florida v. Royer</u>, 460 U.S. 491 (1983), concluded that although police have the right to approach

30

individuals and ask questions, the individual has no obligation to respond and may decline to answer and simply go on his or her way and the refusal to respond alone did not provide a legitimate basis for an investigative stop.  Id. at 122-23.  The Illinois Supreme Court then determined that flight may simply be an exercise of one's right to "go on one's way" and therefore could not constitute reasonable suspicion justifying a Terry stop.  The United States Supreme Court reversed, and held that the officers did have reasonable suspicion to make the stop.  The Supreme Court pointed out that evasive behavior is a pertinent factor in determining reasonable suspicion and that the defendant's unprovoked flight upon noticing the police was "the consummate act of evasion."  Id. at 124-25.  The Court acknowledged the holding in Florida v. Royer, 460 U.S. 491 (1983), that when an officer, without reasonable suspicion, approaches an individual, the individual has the right to ignore the police and go about his business and the holding in Florida v. Bostic, 501 U.S. 429 (1991), that a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  Wardlow, 528 U.S. at 125 (citing Royer, 460 U.S. at 498 and Bostic, 501 U.S. at 437).  The Court concluded, however, that "unprovoked flight is simply not a mere refusal to cooperate," and is the opposite of going about one's business.  Wardlow, 528 U.S. at 125.

The present case, however, does not have as a component the headlong flight at issue in Wardlow.  While it is true that the Eleventh Circuit has noted that any kind of flight, even walking away, might support a finding of reasonable suspicion, the Eleventh

31

Circuit has consistently evaluated the characteristics of the flight, such as the duration of the flight, whether the suspect made eye contact with the law enforcement officer and then reacted quickly, whether the suspect engaged in headlong flight or walked away, whether the defendant was provoked by the officers into fleeing, and whether the defendant cleared obstacles such as fences during his or her flight. United States v. Franklin, 323 F.3d 1298, 1302 (11th Cir. 2003) (concluding that defendant's unprovoked lengthy flight at full speed in which he ran behind the building, climbed a fence, sprinted across a parking lot, and began to scale a second fence could be considered to support reasonable suspicion and contrasting case from a Seventh Circuit case in which the defendant was improperly provoked to flee and there was no reasonable suspicion to stop the defendant); United States v. Gordon, 231 F.3d 750, 756-57 (11th Cir. 2000) (concluding reasonable suspicion existed when after marked police vehicle approached, the defendant's eyes "lit up," he made eye contact with the police, he moved quickly towards nearby car, entered that car, and then drove away in the opposite direction from the officers). Here, the circumstances of Defendant's attempted exit are not enough to invoke suspicion. Defendant did not sprint away. (Gov't Ex. 1). He did not scale fences or run behind buildings. He merely attempted to exit the food mart in a path he had appeared to be on when Officer Barrientos entered the food mart. Based on the video footage from Officer Barriento's body camera, it appears that Defendant was already facing the doorway when Officer Barrientos entered. (Gov't Ex. 1). There is an absence of any evidence that Defendant's attempted exit was in response to police

32

activity.  Defendant did not get a "deer in headlights look" or otherwise change his demeanor.  (Gov't's Ex. 1).  It cannot even be said that Defendant was walking quickly or hurriedly.  (Gov't's Ex. 1).  Defendant appeared to continue on his current trajectory towards the front of the building and the exit at a slow pace.  (Gov't's Ex. 1).  Thus, Defendant merely did what he had a right to do, and attempted to walk out of the store. The fact that Officer Barrientos was attempting to talk to Defendant at the time does not give rise to reasonable suspicion without more.  An individual approached by a police officer has no affirmative duty to answer questions, and a refusal to cooperate with police officers, without more, cannot support a finding of reasonable suspicion. Bostick, 501 U.S. at 437 ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); Royer, 460 U.S. at 497-98 (explaining that a person approached by police officers may decline to listen to the questions at all and go on his way and that he "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds"); United States v. Heard, No. 17-12397, 2018 WL 823895, at *2, 7-8 (11th Cir. Feb. 12, 2018) (noting that refusal to cooperate can certainly contribute to reasonable suspicion, but holding that defendant's refusal to consent to a search and indication that he was opposed to answering anymore of the officers' questions was not sufficient to support a finding of reasonable suspicion even though encounter occurred in high crime area, at night near where gunshots had been reported, and the defendant was the only person

33

around).  Thus, Defendant's mere attempt to walk away when the police have no lawful right to detain him is not sufficient to justify a Terry stop.  United States v. Briggs, 720 F.3d 1281, 1287 (10th Cir. 2013); United States v. Johnson, 620 F.3d 685, 688-89, (6th Cir. 2010) (rejecting the notion that ignoring an unconstitutional order contributes to reasonable suspicion and finding no reasonable suspicion to stop defendant in a high crime area at 4:00 a.m. where officers were responding to vague, unreliable 911 call reporting suspicious people in the area even though the defendant was walking away from the scene, continued walking and did not stop when officers called out to him, and refused to put up his hands in response to the officers' orders); Jacob v. Village of Ottawa Hills, 5 F. App'x 390, 395 (6th Cir. 2001) (holding no reasonable suspicion where defendant answered officer's initial questions, but broke off conversation in defensive and hostile manner, claimed that questions were racially motivated, and walked away when officer requested identification and distinguishing Wardlow on the grounds that the defendant did not flee, but rather walked away from the encounter and stated his intention to return to his original location); United States v. Davis, 94 F.3d 1465, 1468-69 (10th Cir. 1996) (merely walking away not enough); United States v. Hayes, No. 1:15-CR-125-LMM-AJB, 2016 WL 6396213, at *8 (N.D. Ga. Oct. 6, 2016) (concluding that the fact that defendant obstructed officers trying to handcuff him was of no moment in reasonable suspicion analysis because defendant could lawfully resist an unlawful arrest); United States v. Marcelino, 736 F. Supp. 2d 1343, 1346, 1351 (N.D. Ga. Aug. 23, 2010) (concluding that agents lacked reasonable suspicion to conduct Terry

34

stop of defendant where after agents greeted defendant and his companion, defendant and his companion glanced back and looked in agents' direction, turned away from agents, and started to walk away, and agent then said "policia" in Spanish and asked them to stop, but defendant and his companion glanced back one more time and then continued to walk away a little faster, but ultimately stopped once directed not to run from officers); see also WBY, Inc. v. DeKalb Cty., 695 F. App'x 486, 493 (11th Cir. 2017) ("Georgia law clearly provides that citizens have no freestanding obligation to comply with a officer's requests when the officer is not discharging a lawful duty; For example, when an officer detains an individual without reasonable suspicion, the citizen is free to ignore requests and/or to walk away, and . . . no charge of obstruction will lie."); Merenda v. Tabor, 506 F. App'x 862, 867 (11th Cir. 2013) (concluding that fact that defendant resisted arrest did not give officer probable cause to arrest defendant for obstructing an officer because under Georgia law, an individual is entitled to resist arrest if the arrest is unlawful).

The fact that Defendant attempted to push his way out of the entrance to the store does not provide the necessary weight to support the showing of reasonable suspicion. Here, the Government's video evidence depicts Defendant facing towards the front door as Officer Barrientos is entering the food mart. (Gov't's Ex. 1). When Defendant continues to walk toward the door as Officer Barrientos insists that he not walk away from her, Officer Barrientos is standing a foot inside the doorway, directly in front of the front double doors, in front of the only door of the two that was operational. (Tr. 50-51).

35

Thus, the only way through the front door was also going to be through Officer Barrientos. As Defendant headed towards Officer Barrientos and the front door, Officer Barrientos did not yield the path to the doorway, but instead performed a hand check on his chest once he approached her before he ever touched her. (Tr. 19, 51-52). Because Officer Barrientos admits that she touched Defendant first, this Court concludes that Defendant did not push his body weight into hers to try to get out of the door until Officer Barrientos hand checked him. Certainly under the circumstances, Defendant could have deduced at this point that Officer Barrientos had no intention of letting him leave. Officer Barrientos stated that Defendant "could have gotten away except that I was not allowing him to because he was going to be detained" and that there was no other exit door. (Tr. 55). Officer Barrientos testified, "My purpose was not to let him get away." (Tr. 55). Officer Barrientos further testified that if Defendant had said, "Ma'am, excuse me, you're in the middle of the door, can you please get out of my way so I can go about my business," she would not have allowed him to leave the building. (Tr. 56). Based on this Court's view of the video evidence, Defendant did not use a lot of force trying to exit the building. Defendant simply tried to push by Officer Barrientos. Thus, Defendant's attempt to continue his forward motion out of the door did not create the necessary suspicion because Officer Barrientos had no justification at that point to block Defendant's path or to physically prevent him from leaving. Indeed, Officer Barrientos' active prevention of his exit both with her body blocking the exit and her hands preventing his forward motion with the hand check maneuver in a sense was a

AO 72A
(Rev.8/82)

provocation for him to attempt to push his way out of the door.  Thus, Defendant's attempt to leave in this manner does not create reasonable suspicion.  Under the totality of the circumstances in this case, this Court concludes that the officers did not have reasonable suspicion to stop Defendant.  Accordingly, Defendant's Motion should be **GRANTED** with respect to the stop on January 12, 2017, and evidence obtained during the encounter should be **SUPPRESSED**.[6]

### B.   The April 28, 2017 Stop

This Court finds that the April 28, 2017 stop of Defendant was justified by reasonable suspicion.  With respect to the April 28, 2017 stop, the seizure did not occur until Officer Crowder intercepted Defendant after he had fled and placed him in handcuffs because that was the first point in which his liberty was restrained.  (Tr. 93-94).  As discussed above, "[a] seizure occurs for Fourth Amendment purposes, . . . only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained."  Perez, 443 F.3d at 778.  A seizure by means of show of

---

[6] Although Defendant asserts in his Motion to Suppress that all evidence during any subsequent search of his person constitutes fruit of the poisonous tree and should be suppressed.  Defendant, however, does not present any argument that evidence obtained during the April 28, 2017 arrest should be suppressed as fruit of the poisonous tree based on the illegality of the January 12, 2017 search.  See United States v. Witten, 649 F. App'x 880, 885-86 (11th Cir. 2016) (noting that in order to suppress evidence there must be a connection between the lawless police conduct and the discovery of the challenged evidence).  Indeed, there is no apparent connection between the searches conducted on January 12, 2017, and April 28, 2017.  The searches occurred months apart and Officer Crowder testified that he had never seen Defendant during his three-year stint as a patrol officer in Zone 3 and had never arrested him before.  (Tr. 100-01).

37

authority requires both a show of authority and *submission* to that authority.  United States v. Dolomon, 569 F. App'x 889, 892-93 (11th Cir. 2014); United States v. House, 684 F.3d 1173, 1199 (11th Cir. 2012) (citing California v. Hodari D, 499 U.S. 621, 628-29 (1991)).  A law enforcement officer does not effect a seizure by means of a show of authority until his *"words and actions actually produce his stop*."  House, 684 F.3d at 1199 (internal quotations omitted) (emphasis added).

Defendant appears to argue the seizure occurred when Officer Crowder instructed him to "come here."  No seizure, however, occurred by that point because Defendant did not submit to Officer Crowder's authority; instead Defendant sprinted away.  See, e.g., California v. Hodari D., 499 U.S. 621, 629 (1991) (holding that a seizure does not occur where the police command the suspect to halt and the suspect does not do so); United States v. Freeman, 735 F.3d 92, 95-97 (2d Cir. 2013) (holding that a suspect who continued walking when approached by a police officer did not submit until physically restrained by the officer); United States v. Hughes, No. 1:16-CR-00451-ELR-JSA, 2018 WL 1148125, at *4 (N.D. Ga. Jan. 29, 2018) (concluding that defendant was not seized when he ignored officers' commands, but was seized once he submitted to the officers' commands and stopped walking away).  The Supreme Court has held that in such circumstances, the seizure does not occur until the law enforcement officers actually make the stop.  Hodari D., 499 U.S. at 629 (explaining that fleeing defendant was not seized he was tackled even though police had commanded him to halt); Dolomon, 569 F. App'x at 893 (explaining that fleeing defendant was not actually seized by police until

38

he was apprehended at apartment complex following car chase). Accordingly, all the facts within the knowledge of the officers up until the point at which the stop of Defendant is made is considered in determining whether the officers had reasonable suspicion. United States v. Felix, 715 F. App'x 958, 962 (11th Cir. 2017) (explaining that reasonable suspicion is determined from the totality of the circumstances and from the collective knowledge of all of the officers involved in the stop); United States v. White, 593 F.3d 1199, 1203 (11th Cir. 2010) (same). Here, the detention occurred when Officer Crowder intercepted Defendant after Defendant's flight and placed him in handcuffs.

Based on the collective knowledge at the time of the stop, the officers knew the following: (1) Officer Crowder saw what looked like Defendant rolling a marijuana cigarette[7]; (2) Defendant took off running, with what looked like a blunt in his left hand when the officers asked him to "come here for a second" and kept fleeing even though Officer Magana yelled for him to stop; and (3) Officer Magana saw a black handgun in

---

[7] Defendant offered the testimony of his girlfriend to persuade the Court that he was not rolling a marijuana cigarette, but rather eating a chicken wing. The Court observed the officers' demeanor during the hearing and finds that the officers' testimony that they believed Defendant was rolling a marijuana cigarette was credible. Indeed, when Defendant was ultimately stopped, Defendant was found with a bag of marijuana that he dropped to the ground and used his right foot to stomp the marijuana into the ground. (Tr. 94-95). The officers collected nearly twenty-five grams of marijuana from the ground. Although Defendant makes much of the fact that the officers' recollections differed on what color the rolling papers were, this Court finds that the officers' differing recollections of this minor fact was not indicative of deception, but rather failing memories on a point of little consequence.

Defendant's right hand that was no longer there after Defendant stumbled through a fence.[8] United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (holding that everything the officers knew at the time of the detention is considered in the reasonable suspicion analysis). These factors clearly provided a basis for the officers to formulate reasonable suspicion that Defendant was involved in criminal activity. See Defendant's unprovoked flight on April 28, 2017, unlike his attempt to walk away from Officer Barrientos on January 12, 2017, provided a basis for the officer's formulation of reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (holding that defendant's unprovoked headlong flight upon noticing the police was suggestive of wrongdoing supported the officer's conclusion that there was reasonable suspicion to make the stop); Franklin, 323 F.3d at 1302 (concluding that defendant's unprovoked lengthy flight at full speed in which he ran behind the building, climbed a fence, sprinted across a parking lot, and began to scale a second fence could be considered to support reasonable suspicion); United States v. Gordon, 231 F.3d 750, 756-57 (11th Cir. 2000) (concluding reasonable suspicion existed when after marked police vehicle approached, the defendant's eyes "lit up," he made eye contact with the police, he moved quickly towards a nearby car, entered that car, and then drove away in the opposite direction

---

[8] The Government argues that the Court should consider the fact that Defendant is discovered dropping a bag of marijuana and stomping it to the ground at the conclusion of the foot chase when determining whether the officers had reasonable suspicion. The video footage, however, does not reflect that this occurred prior to the time Defendant was placed in handcuffs. (Gov't's Ex. 3). Thus, it appears that the stop occurred before Defendant dropped the bag of marijuana.

from the officers).  Here, Defendant did not merely walk away from police, he sprinted away from police officers at full speed for forty-five seconds through fences and woods, and around buildings, and was chased by police commanding him to stop.  (Gov't's Ex. 3).  This behavior alone justifies the officers' reasonable suspicion.  Furthermore, additional evidence justifying the officers' reasonable suspicion existed.  Officer Magana observed Defendant running with a gun which he dropped during the foot chase and both officers believed they saw him rolling a marijuana cigarette.  Under these circumstances, reasonable suspicion justified the stop.  Therefore, Defendant's Motion to Suppress Evidence obtained during the April 28, 2017 stop should be **DENIED**.

## CONCLUSION

Based on the foregoing reasons, Defendant's Motions to Suppress Evidence should be **GRANTED IN PART AND DENIED IN PART** (Doc. 24, 39), and Defendant's Motion to Suppress Statements (Doc. 25) should be **DENIED**.  Defendant's Motion for Extension of Time to File Pretrial Motions and to Continue Pretrial Conference (Doc. 20) and Motion to Adopt and Amend Defendant's Motion to Suppress (Doc. 35) are **GRANTED**.  As there are no further motions pending, the undersigned certifies this case ready for trial.  The Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED** this   10   day of May, 2018.

41

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)